**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MARTIN BERTISCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| BAXALTA INCORPORATED, WAYNE T. | ) | JURY TRIAL DEMANDED |
| HOCKMEYER, BLAKE E. DEVITT, | ) | |
| KAREN FERRANTE, JOHN D. FORSYTH, | ) | |
| GAIL D. FOSLER, JAMES R. GAVIN III, | ) | |
| LUDWIG N. HANTSON, FRANÇOIS | ) | |
| NADER, ALBERT P.L. STROUCKEN, | ) | |
| SHIRE PLC, and BEARTRACKS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.     This action stems from a proposed transaction announced on January 11, 2016 (the "Proposed Transaction"), pursuant to which Baxalta Incorporated ("Baxalta" or the "Company") will be acquired by Shire plc ("Parent") and its wholly-owned subsidiary, BearTracks, Inc. ("Merger Sub," and together with Parent, "Shire").

2.     On January 11, 2016, Baxalta's Board of Directors (the "Board" or the "Individual Defendants") caused Baxalta to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, stockholders of Baxalta will receive $18.00 in cash and 0.1482 of an American Depositary Share ("ADS") of Parent

issued against Parent's ordinary shares per Baxalta share.

3.      On February 22, 2016, defendants issued materially incomplete and misleading disclosures in a Form S-4 Registration Statement (the "Registration Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  The Registration Statement is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4.      Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Baxalta common stock.

9.     Defendant Baxalta is a Delaware corporation and maintains its principal executive offices at 1200 Lakeside Drive, Bannockburn, Illinois 60015.  The Company is a biopharmaceutical company that focuses on developing, manufacturing, and commercializing therapies for orphan diseases and underserved conditions in hematology, oncology, and immunology.  Baxalta's common stock is traded on the NYSE under the ticker symbol "BXLT."

10.     Defendant Wayne T. Hockmeyer ("Hockmeyer") is Chairman of the Board of Baxalta.  According to the Company's website, Hockmeyer is Chair of the Corporate Governance Committee, a member of the Compensation Committee, and a member of the Quality and Compliance Committee.

11.     Defendant Blake E. Devitt ("Devitt") is a director of Baxalta.  According to the Company's website, Devitt is Chair of the Audit Committee, a member of the Corporate Governance Committee, and a member of the Quality and Compliance Committee.

12.     Defendant Karen Ferrante ("Ferrante") a director of Baxalta.  According to the Company's website, Ferrante is a member of the Corporate Governance Committee and the Quality and Compliance Committee.

13.     Defendant John D. Forsyth ("Forsyth") is a director of Baxalta.  According to the Company's website, Forsyth is Chair of the Compensation Committee and a member of the Corporate Governance Committee.

14.     Defendant Gail D. Fosler ("Fosler") is a director of Baxalta.  According to the Company's website, Fosler is a member of the Audit Committee, the Corporate Governance Committee, and the Quality and Compliance Committee.

15.     Defendant James R. Gavin III ("Gavin") is a director of Baxalta.  According to the Company's website, Gavin is Chair of the Quality and Compliance Committee and a member

of the Compensation Committee.

16.     Defendant Ludwig N. Hantson ("Hantson") is a director, President, and Chief Executive Officer ("CEO") of Baxalta.

17.     Defendant François Nader ("Nader") is a director of Baxalta. According to the Company's website, Nader is a member of the Audit Committee and the Compensation Committee.

18.     Defendant Albert P.L. Stroucken ("Stroucken") is a director of Baxalta. According to the Company's website, Stroucken is a member of the Audit Committee and the Compensation Committee.

19.     The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20.     Defendant Parent is a company incorporated in Jersey and a party to the Merger Agreement.

21.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

22.     Baxalta was launched on July 1, 2015 following its separation from Baxter International. The Company is a global biopharmaceutical leader that develops, manufactures, and commercializes therapies for orphan diseases and underserved conditions in hematology, oncology, and immunology. Baxalta's broad and diverse pipeline includes biologics with novel mechanisms and advanced technology platforms such as gene therapy. The Company's therapies are available in more than 100 countries and the Company has advanced biological manufacturing operations across 12 facilities, including state-of-the-art recombinant production

4

and plasma fractionation.

23.    According to the Registration Statement, on July 2, 2015, Flemming Ornskov, M.D. ("Ornskov"), Shire's CEO, contacted Baxalta and requested to speak with Individual Defendant Hantson.  While the Registration Statement states that Ornskov only indicated that he "had an issue of high importance to discuss with Hantson" at this time, Baxalta contacted Goldman, Sachs & Co. ("Goldman Sachs") to provide financial advice, and legal counsel to provide legal advice, regarding Shire's contact.

24.    On July 4, 2015, Hantson called Ornskov, who informed Hantson that Shire wished to discuss a potential strategic transaction with Baxalta.

25.    On July 10, 2015, Ornskov communicated to Hantson a proposal to acquire Baxalta for 0.1687 of a Shire ADS for each outstanding share of Baxalta common stock.

26.    Later that day, Baxalta contacted Citigroup Global Markets Inc. ("Citi") to act as a second financial advisor to Baxalta.  The Registration Statement fails to disclose what prompted the Company's decision to retain a second financial advisor at this time.

27.    On July 31, 2015, Baxalta rejected Shire's proposal.

28.    On August 4, 2015, Baxalta announced that it received a "highly conditional, unsolicited proposal" from Shire to acquire the Company.  In the press release, the Company noted that it received the same proposal privately on July 10, 2015.  According to Individual Defendant Hantson, "a merger at this time would be severely disruptive at this very early stage of Baxalta's existence as a public company and presents a significant and real risk to value creation for our shareholders[.]"  The August 4, 2015 press release attached a letter dated July 31, 2015 from Individual Defendant Hantson to Shire, which stated, in part:

Our board strongly believes that Baxalta's independent global infrastructure and world-class manufacturing operations will provide an excellent platform to grow value for our shareholders. As a new, publicly-traded entity only since July 1, we are just in the initial stages of implementing our growth strategy as a standalone company and our stock has not yet achieved a price level that appropriately reflects the company's value and prospects.

Moreover, we do not believe that a combination of our two companies would be strategically complementary, or that our respective product portfolios would benefit from such a combination. And we do not think the combination would generate substantial operational or revenue synergies, which would be critical to any potential value creation for our shareholders. Perhaps even more importantly, a transaction at this time would be severely disruptive to our young organization and the implementation of a wide variety of critical commercial, R&D, and operational initiatives and thus carries with it significant risks for our shareholders.

29.     On September 9, 2015, Ornskov contacted Hantson and provided a revised proposal pursuant to which Baxalta's stockholders would receive 0.1687 of a Shire ADS and $4.00 in cash per Baxalta share.

30.     On September 20, 2015, Hantson sent a letter to Ornskov rejecting Shire's second proposal.

31.     On October 5, 2015, Ornskov called Hantson to communicate a revised proposal of $45.50, consisting of $18.00 per share in cash and a fraction of a Shire ADS with an implied value of $27.50.  Shire and Baxalta subsequently negotiated and entered into a confidentiality agreement.

32.     On October 16, 2015, Susan Kilsby ("Kilsby"), chairperson of the Shire board, called Individual Defendant Hockmeyer "to introduce herself and to open a line of direct communication."   From this point forward, for reasons undisclosed in the Registration Statement, Hockmeyer became the point of contact and negotiator on behalf of Baxalta, despite the fact that he has been promised the position of deputy chairman of the post-transaction company.

33. On November 1, 2015, Kilsby called Hockmeyer and stated that "Shire remained interested in pursuing a mutually agreeable transaction with Baxalta."

34. On November 9, 2015, Kilsby called Hockmeyer to provide a revised proposal of $46.50, consisting of $18.00 per share in cash and a fraction of a Shire ADS with an implied value of $28.50.

35. On November 30, 2015, Hockmeyer met in person with Kilsby and discussed the possible transaction and potential next steps.

36. On December 8, 2015, Hockmeyer called Kilsby and indicated that any revised proposal from Shire should have a value in the high $40s per share.

37. On December 11, 2015, Kilsby communicated to Hockmeyer a revised proposal of $47.00, consisting of $18.00 per share in cash and a fraction of a Shire ADS with an implied value of $29.00.

38. Baxalta's financial advisors subsequently contacted six parties regarding a potential transaction with Baxalta, and one strategic party ("Company A") executed a confidentiality agreement.

39. On December 13, 2015, Hockmeyer called Kilsby and stated that Baxalta was willing to continue discussions with Shire.

40. Later that day, Baxalta's representatives communicated to Shire's representatives that, as a condition to engaging in merger agreement discussions, Baxalta would require Shire's advance agreement that the combined company's board would include a number of Baxalta directors roughly proportionate to the ownership that Baxalta stockholders would hold in the combined company. The Registration Statement fails to disclose who at Baxalta required this condition to continue discussions with Shire. Baxalta's advisors reiterated this condition to

Shire's advisors on December 15, 2015.

41.     Also on December 15 – nearly six months after discussions began between Baxalta and Shire – the Board established a transaction committee (the "Transaction Committee") comprised of conflicted Hockmeyer, as well as Individual Defendants Nader and Devitt.

42.     On December 16, 2015, the Transaction Committee met and "reconfirmed the importance of obtaining Shire's advance agreement" to include Baxalta directors on the combined company board. Later that day, Shire confirmed its agreement on that point.

43.     On December 22, 2015, the Board met and, in lieu of any real market check, determined to request from Shire "a limited go-shop provision that would allow Baxalta to continue, after the signing of a definitive agreement with Shire, to share due diligence information and discuss the terms of a possible transaction with any party that had executed a confidentiality agreement with Baxalta prior to Baxalta's execution of a merger agreement with Shire" – in other words, only Company A. The Board made this decision despite the fact that Baxalta's advisors had reached out to the six potential parties for the first time the preceding week, and the fact that only Company A had entered into a confidentiality agreement with Baxalta.

44.     On December 30, 2015, Company A's CEO called Individual Defendant Hantson and informed him that Company A was no longer interested in exploring a transaction with Baxalta. Nevertheless, the Board pressed forward with the strategy of continuing discussions with Shire and attempting to secure the above-referenced go-shop provision, which would be meaningless, as only Company A had entered into a confidentiality agreement and was now out of the process.

45.     On January 8, 2016, Hockmeyer met with Kilsby to discuss, among other things, the setting of the exchange ratio between Shire ADSs and Baxalta common stock.  During the meeting, Kilsby asked Hockmeyer to serve as deputy chairman of the combined company's board of directors, and indicated that two other Baxalta directors could be invited to join the combined company's board of directors.  Despite this clear conflict, Hockmeyer continued to serve as Baxalta's negotiator in connection with a potential transaction.

46.     On January 9, 2016, Hockmeyer called Kilsby and stated that he would accept the offer to serve as the deputy chairman of the board of the combined company, with two other Baxalta directors joining the combined company's board.  Hockmeyer and Kilsby discussed a revised proposal of $18.00 per share in cash and 0.1482 of a Shire ADS for each outstanding share of Baxalta common stock.  Hockmeyer also informed Kilsby that Baxalta would withdraw its request for a go-shop provision in a merger agreement.

47.     On January 10, 2016, the Board held a telephonic meeting to discuss the proposed combination.  The Board approved the Proposed Transaction, and the Merger Agreement was executed the following day.

48.     The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 5.4(a) of the Merger Agreement states, in relevant part:

> (a) From the date of this Agreement until the earlier of the Effective Time and the termination of this Agreement in accordance with Section 8.1, except as provided in Section 5.4(b) or Section 5.4(d), (i) the Company shall cease, and shall cause its officers and directors and shall direct the other Company Representatives to cease, and cause to be terminated all existing discussions, negotiations and communications with any persons or entities with respect to any Company

Acquisition Proposal (other than the transactions contemplated hereby); (ii) the Company shall not, and shall not authorize or permit any officers, directors, investment bankers, attorneys, accountants and other advisors, agents and representatives (collectively, "Company Representatives") to, directly or indirectly through another person, (A) initiate, seek, solicit or knowingly encourage (including by way of furnishing any non-public information relating to the Company or any of its subsidiaries), or knowingly induce or take any other action which would reasonably be expected to lead to the making, submission or announcement of any Company Acquisition Proposal, (B) engage in negotiations or discussions with, or provide any non-public information or non-public data to, any person (other than Parent or any of its affiliates or any Parent Representatives) relating to any Company Acquisition Proposal or grant any waiver or release under any standstill or other agreement (except that if the Company Board (or any committee thereof) determines in good faith that the failure to grant any waiver or release would be inconsistent with the Company directors' fiduciary duties under applicable law, the Company may waive any such standstill provision in order to permit a third party to make a Company Acquisition Proposal) or (C) resolve to do any of the foregoing; (iii) the Company shall not provide and shall, within twenty-four (24) hours of the date hereof, terminate access of any third party to any data room (virtual or actual) containing any of the Company's confidential information; and (iv) within two (2) Business Days after the date hereof, the Company shall request the return or destruction of all confidential, non-public information provided to third parties that have, since the Distribution Date, entered into confidentiality agreements relating to a possible Company Acquisition Proposal with the Company or any of its subsidiaries.

49.     Further, pursuant to Section 5.4(b) of the Merger Agreement, the Company must advise Shire, within twenty-four hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal. Section 5.4(b) of the Merger Agreement states, in relevant part:

The Company (A) shall promptly (and in any case within twenty-four (24) hours) provide Parent notice (1) of the receipt of any Company Acquisition Proposal, which notice shall include a complete, unredacted copy of such Company Acquisition Proposal, and (2) of any inquiries, proposals or offers received by, any requests for non-public information from, or any discussions or negotiations sought to be initiated or continued with, the Company or any Company Representatives concerning a Company Acquisition Proposal that constitutes or is reasonably likely to constitute or lead to a Company Acquisition Proposal, and disclose the identity of the other party (or parties) and the material terms of such inquiry, offer, proposal or request and, in the case of written materials, provide copies of such materials, (B) shall promptly (and in any case within twenty-four

10

(24) hours) make available to Parent copies of all written materials provided by the Company to such party but not previously made available to Parent and (C) shall keep Parent informed on a reasonably prompt basis (and, in any case, within twenty-four (24) hours of any significant development) of the status and material details (including amendments and proposed amendments) of any such Company Acquisition Proposal or other inquiry, offer, proposal or request.

50.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Shire a matching right with respect to any "Company Superior Proposal" made to the Company.  Section 5.4(d) of the Merger Agreement provides:

(d) If, at any time prior to the receipt of the Company Stockholder Approval, the Company Board receives a Company Acquisition Proposal that the Company Board determines in good faith constitutes a Company Superior Proposal, the Company Board may (i) effect a Company Adverse Recommendation Change or (ii) authorize the Company to terminate this Agreement pursuant to Section 8.1(i) in order to enter into a definitive agreement providing for a Company Superior Proposal if (A) the Company Board determines in good faith that the failure to take such action would reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable Law; (B) the Company has notified Parent in writing that it intends to effect a Company Adverse Recommendation Change or terminate this Agreement; (C) if applicable, the Company has provided Parent a copy of the proposed definitive agreements between the Company and the person making such Company Superior Proposal; (D) for a period of five (5) days following the notice delivered pursuant to clause (B) of this Section 5.4(d), the Company shall have discussed and negotiated in good faith and made Company Representatives available to discuss and negotiate in good faith (in each case to the extent Parent desires to negotiate) with Parent Representatives any proposed modifications to the terms and conditions of this Agreement so that the failure to take such action would no longer reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable Law (it being understood and agreed that any amendment to any material term or condition of any Company Superior Proposal shall require a new notice and a new four (4) day negotiation period; and (E) no earlier than the end of such negotiation period, the Company Board shall have determined in good faith, after considering the terms of any proposed amendment or modification to this Agreement, that (x) the Company Acquisition Proposal that is the subject of the notice described in clause (B) above still constitutes a Company Superior Proposal and (y) the failure to take such action would still reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable

11

Law.

51.     The Merger Agreement also contains a provision for a termination fee of $369 million, payable by the Company to Shire under certain circumstances.

52.     Following the close of the Proposed Transaction, Individual Defendant Hockmeyer, Baxalta's Chairman and primary negotiator in connection with the Proposed Transaction, will become deputy chairman of the post-transaction company.  Two additional directors from the Baxalta Board will be included on the post-transaction board of directors. Baxalta's executive officers may also retain positions following the close of the Proposed Transaction.  In addition, the Company's executive officers stand to receive over $109.8 million in connection with the merger.  Individual Defendant Hantson alone stands to receive nearly $31.5 million.

### *The Materially Incomplete Registration Statement*

53.     On February 22, 2016, defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.  The Registration Statement omits material information that must be disclosed to Baxalta's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

54.     The Registration Statement omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of Goldman Sachs and Citi.  This omitted information, if disclosed, would significantly alter the total mix of information available to Baxalta's stockholders.

55.     For example, the Registration Statement states that "[t]he positions of Baxalta's executive officers with the combined company have not yet been determined."  However, the Registration Statement fails to disclose the timing and nature of all communications regarding

future employment of Baxalta's officers, including who participated in all such communications.

56. The Registration Statement fails to disclose who at Baxalta required Shire's advance agreement that the combined company's board would include Baxalta directors.

57. With respect to Baxalta's financial projections, the Registration Statement fails to disclose: (i) net income; (ii) reconciliation of GAAP net income to non-GAAP unlevered free cash flows and non-GAAP EBITDA; (iii) earnings per share; (iv) dividends; (v) stock-based compensation; (vi) the "normalized" 2025 figures used by Citi; (vii) the pension figures used by Goldman Sachs; and (viii) the figures for the "other expenses."

58. With respect to Citi's *Selected Public Companies Analyses* for Baxalta and Shire, the Registration Statement fails to disclose the objective selection criteria, company-by-company pricing multiples, and financial metrics for each of the selected companies observed by Citi in its analysis.

59. With respect to Citi's *Selected Precedent Transactions Analysis* for Baxalta, the Registration Statement fails to disclose the objective selection criteria and transaction-by-transaction enterprise values, pricing multiples, and financial metrics for each of the selected transactions observed by Citi in its analysis. The Registration Statement further fails to disclose the reasons CVR value was disregarded, and which of the selected transactions were affected.

60. With respect to Citi's *Discounted Cash Flow Analysis* of Baxalta, the Registration Statement fails to: (i) quantify the "normalized" assumptions used by Citi in the terminal period; (ii) disclose the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates; and (iii) identify the assumptions underlying Citi's estimate of Baxalta's weighted average cost of capital ("WACC").

61.     With respect to Citi's *Pro Forma Discounted Cash Flow Analysis*, the Registration Statement fails to: (i) quantify the Dyax adjustments used by Citi; (ii) quantify the "normalized" assumptions used by Citi in the terminal period; (iii) disclose the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates; and (iv) identify the assumptions underlying Citi's estimate of the combined company's WACC.

62.     With respect to Goldman Sachs' *Selected Precedent Transactions Analysis*, the Registration Statement fails to disclose the objective selection criteria, company-by-company pricing multiples, and financial metrics for each of the selected companies observed by Goldman Sachs in its analysis, as well as the criteria by which the premiums were deemed "not applicable" and the multiples were deemed "not meaningful."

63.     With respect to Goldman Sachs' *Discounted Cash Flow Analysis* for Baxalta, the Registration Statement fails to: (i) identify the assumptions underlying Goldman Sachs' estimate of Baxalta's WACC; (ii) disclose the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates; and (iii) include the pension liability in the valuation summary.

64.     With respect to Goldman Sachs' *pro forma Discounted Cash Flow Analysis*, the Registration Statement fails to: (i) identify the assumptions underlying Goldman Sachs' estimate of Baxalta's WACC; and (ii) disclose the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates.

65.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analyses*, the Registration Statement fails to identify the assumptions underlying Goldman Sachs' estimate of Baxalta's cost of equity and the combined company's cost of equity.

66.     The Registration Statement fails to explain the omission of any selected companies analysis by Goldman Sachs.

67.     The Registration Statement also fails to provide valuation summaries detailing the calculation of fully diluted shares, equity value (at the unaffected price and the offer price), and enterprise value (at the unaffected price and the offer price).

## COUNT I

**(Individual Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Baxalta)**

68.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

69.     The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Baxalta is liable as the issuer of these statements.

70.     The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

71.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

72.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to shareholders.

73.     The Registration Statement is an essential link in causing plaintiff to approve the Proposed Transaction.

74.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

75.     Because of the false and misleading statements in the Registration Statement, plaintiff is threatened with irreparable harm.

## COUNT II

**(Individual Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Shire)**

76.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

77.     The Individual Defendants and Shire acted as controlling persons of Baxalta within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Baxalta and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

78.     Each of the Individual Defendants and Shire was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

16

had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Registration Statement.

80. Shire also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

81. By virtue of the foregoing, the Individual Defendants and Shire violated Section 20(a) of the 1934 Act.

82. As set forth above, the Individual Defendants and Shire had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

83. As a direct and proximate result of defendants' conduct, plaintiff is threatened with irreparable harm.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

17

C.     Directing the Individual Defendants to file a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 9, 2016                                   DiTOMMASO♦LUBIN, P.C

By:   /s/ Vincent L. DiTommaso

**RIGRODSKY & LONG, P.A.**         Vincent L. DiTommaso
Seth D. Rigrodsky                     DiTOMMASO♦LUBIN, P.C.
Brian D. Long                          17W220 22nd Street, Suite 410
Gina M. Serra                          Oakbrook Terrace, IL  60181
Jeremy J. Riley                       (630) 333-0000
2 Righter Parkway, Suite 120      (630) 333-0333 (Fax)
Wilmington, DE 19803            vdt@ditommasolaw.com
 (302) 295-5310                    eservice@ditommasolaw.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, MARTIN BERTISCH, hereby verify that I have reviewed the foregoing complaint (the "Complaint") and I have authorized the filing of the Complaint. The statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

Dated: _3/1/2016_         _Martin Bertisch_

                                          MARTIN BERTISCH